UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

LOIS HERRERA, et al.,

                   Plaintiffs,

       -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION and RICHARD CARRANZA,

                   Defendants.

</td></tr>
</table>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____1/23/2024____

1:21-cv-7555-MKV

OPINION AND ORDER
DENYING IN PART
AND GRANTING IN PART
MOTION FOR
SUMMARY JUDGMENT

MARY KAY VYSKOCIL, United States District Judge:

Plaintiffs Lois Herrera, Jaye Murray, and Laura Feijoo bring the above-captioned action against Defendants the New York City Department of Education ("DOE") and Richard Carranza, the former Chancellor of the DOE. Plaintiffs are white women who contend that they held high-level positions at the DOE until Defendants implemented a discriminatory policy of considering race that caused Plaintiffs to be demoted and sidelined in favor of less qualified "candidates of color." Defendants seek summary judgment on all of Plaintiffs' claims. Because Plaintiffs offer evidence of a policy of race-based discrimination at Carranza's DOE, Defendants' motion for summary judgment is DENIED with respect to Plaintiffs' claims of race-based discrimination in violation of 42 U.S.C. §1983. The motion for summary judgment is GRANTED with respect to Plaintiffs' other claims for the reasons set forth below.

## I.      BACKGROUND[1]

### A.  The Defendants and the Evidence of their Race-Based Staffing Policy

The defendants are the New York City Department of Education ("DOE") and its former

---

[1] The facts are taken from evidence cited in the parties' Local Civil Rule 56.1 statements [ECF No. 44 ("Def. 56.1"); ECF No. 60-1 ("Ramirez Depo."); ECF No. 60-2 ("Carranza Depo."); ECF No. 60-3 ("de Blasio Depo."); ECF No. 60-4 ("Robinson Depo."); ECF No. 68 ("Pl. Counter 56.1")]. *See* Fed. R. Civ. P. 56(c)(1).

Chancellor Richard Carranza.  In April 2018, non-party and then-mayor Bill de Blasio appointed Carranza to lead the DOE during de Blasio's second term as the mayor of New York City.  *See* Def. 56.1 ¶ 11; Pl. Counter 56.1 ¶ 11.  Non-party Ursulina Ramirez "was in charge of interviewing and selecting, with the mayor, high-level staff members" of the de Blasio administration, including the chancellor and high-level staff of the DOE.  Ramirez Depo. at 15:20–23; *see id.* at 35:23–36:2; *id.* at 37:4–8; *id.* at 49:17–19, 51:5–18.

The parties dispute whether the mayor, the DOE, and Carranza had a policy or practice of selecting high-level staff at the DOE based on race.  *See* Pl. Counter 56.1 ¶ 13; *see* Def. 56.1 ¶ 13. Defendants assert in their motion papers that "[d]e Blasio did not task Carranza with a policy to have a diverse cabinet or administration" [ECF No. 57 ("Def. MSJ") at 2].  Defendants cite de Blasio's deposition testimony that his "first consideration" in making staffing decisions at the DOE "was always the capacity to do the job."  Def. MSJ at 2; *accord* de Blasio Depo. at 49:25–50:2.  In addition, Defendants point out, Carranza testified that de Blasio did not "specifically" instruct him to select a racially diverse staff at the DOE.  Carranza Depo. at 85:13–15, 86:10–12.  And Carranza denied ever "tak[ing] the race of the candidates into account when filling senior-level positions." Carranza Depo. at 130:19–23.

Plaintiffs, however, offer evidence of a race-based employment policy at the DOE.  The former mayor testified under oath that it was "*a policy* for [his] administration to reflect the diversity of the city."  de Blasio Depo. at 26:13–15 (emphasis added); *see id.* at 26:18–20 (stating that he wanted diversity "people could see").  While maintaining that race was "not the central factor," the former mayor testified that "race" was an "[i]mportant factor" in "hiring decisions at the DOE."  de Blasio Depo. at 50:7–15; *see id.* at 49:2–50:15.  Indeed, de Blasio was "certain" he instructed Ramirez that "*the administration of the Department of Education should reflect the diversity of New York City.*"  de Blasio Depo. at 26:7–12 (emphasis added); *see* Ramirez Depo. at

42:18–43:2.  He believed he had conveyed the same message to Carranza.  *See* de Blasio Depo. at 25:10–26:6; *see also* Carranza Depo. at 24:12–25:2; *id.* at 86:15–16.  And while Carranza testified that de Blasio never told him to consider race in selecting the leadership of the DOE, Carranza admitted that de Blasio "did express to [Carranza]" that "the government . . . should look like New York City."  Carranza Depo. at 24:12–25:2; *see id.* at 85:13–15, 86:10–12.

Plaintiffs offer specific evidence that de Blasio practiced race-conscious hiring at the DOE, including when he hired Carranza.  Carranza testified to his understanding that one reason "why [de Blasio] chose" him was his "Latino heritage," making Carranza "a chancellor of color."  Carranza Depo. at 24:5–11.  Multiple witnesses confirm that "[t]he mayor was very involved in staffing decisions" at the DOE, well beyond appointing the chancellor.  Ramirez Depo. at 21:12–13; *see id.* at 35:23–36:2; Carranza Depo. at 33:22–33:24 (explaining that "the mayor ha[d] final say especially for senior leadership roles" and "was very interested").  Ramirez, who led the effort to select candidates for his review, explained that the mayor sometimes "*fixated on diversity of candidates.*"  Ramirez Depo. at 93:9–14 (emphasis added); *see also id.* at 93:3–6.  Plaintiffs cite an email that Ramirez wrote to other de Blasio staffers asking for help convincing the mayor to approve four candidates, two of whom were white, for positions at the DOE [ECF No. 60-10 ("Ramirez Email")].  She wrote: "*If he gets fixated with diversity* . . . help us muster through.  *We know it's a priority.*"  Ramirez Email (emphases added).

Plaintiffs also offer evidence that Carranza shared de Blasio's focus on race in selecting the leadership of the DOE.  Shortly after de Blasio appointed him chancellor, Carranza was quoted in the New York Times proclaiming: "There is no daylight between Mayor de Blasio and myself . . . . The equity agenda championed by our mayor is my equity agenda" [ECF No. 60-11 ("NYT Article")].  In another article, Carranza was quoted complaining about this lawsuit, saying: "The children in New York City – 70% of whom are black and brown children – get to see senior level

administrators that look like them. What's wrong with that?" [ECF No. 60-12]. At his deposition, Carranza affirmed under oath that he believes it is "important" for students to "see people that look like them . . . . in senior [DOE] leaders," even while he denied acting on that belief. Carranza Depo. at 130:5–16. When asked about Ramirez's email stating that the racial diversity of DOE staff was "a priority" for the mayor, Carranza affirmed: "diversity and equity is a priority for me as well . . . . We want senior leadership to reflect the diversity of the school system." Carranza Depo. at 87:2–5.

Plaintiffs argue that for de Blasio and Carranza "equity" at the DOE meant "putting people of color in high-level positions" [ECF No. 61 ("Herrera Decl.") ¶ 17; ECF No. 62 ("Murray Decl.") ¶ 14; *see* ECF No. 63 ("Feijoo Decl.") ¶ 28]. According to Plaintiffs, shortly after he was appointed chancellor, Carranza announced that he was changing the structure of the DOE and told DOE staff: "If you draw a paycheck from the DOE, you will either get on board with my equity platform or leave." Herrera Decl. ¶ 17; *accord* Murray Decl. ¶ 14; *see* Feijoo Decl. ¶ 28. Plaintiffs contend that Carranza announced: "This is our time. Our time." Feijoo Decl. ¶ 28. According to Plaintiffs, when he made this announcement, he was "standing with" and referring to "Black and Latino individuals." Feijoo Decl. ¶ 28; *see* Def. MSJ at 6.

Carranza denied all of this at his deposition. Carranza Depo. at 106:15–107:4. He testified that "equity" is "[n]ot specifically" about "race." Carranza Depo. at 30:18–20. He further testified that, in terms of staffing decisions, the "equity agenda" meant only that he "needed people that could actually deliver" better results for students. Carranza Depo. at 30:16–23.

Plaintiffs argue that "equity training" sessions "held pursuant to the DOE's policy" provide evidence of the chancellor's vision of equity [ECF No. 64 ("Chislett Decl.") ¶ 8]. Plaintiffs offer testimony that the "tenor and subject matter of these trainings changed dramatically when Carranza became Chancellor." Chislett Decl. ¶ 7. For example, the DOE hosted a training at which the

facilitator informed white DOE staffers that "moving towards racial equity" means "*you will have to step back from things.  You might fear losing your job*."  Chislett Decl. ¶ 15 (emphasis added).  Another instructor reiterated this point, stating: "*White colleagues must take a step back and yield to colleagues of color*."  Chislett Decl. ¶ 9.

According to Plaintiffs, at one training, LaShawn Robinson, whom Carranza promoted to Deputy Chancellor, made a disparaging remark about "Whiteness."  Chislett Decl. ¶¶ 10, 32; Herrera Decl. ¶ 19.  Plaintiffs also contend that senior officials at Carranza's DOE, including the head of the Office of Equity & Access, boasted that the DOE was now "Wakanda," a black utopia in the superhero franchise "Black Panther."  Herrera Decl. ¶ 67.  Plaintiffs offer a photograph of Carranza crossing his arms over his chest in an "X," which Plaintiffs contend shows Carranza doing a "Black Panther salute" to Wakanda [ECF No. 60-45].  Carranza Depo. at 193:3.  Carranza disputes that contention and testified that he was "doing the Bronx salute."  Carranza Depo. at 193:21.  He further testified: "I'd never even seen Wakanda or 'Black Panther' or whatever that is.  I don't know what that is."  Carranza Depo. at 193:22–24.

In a similar vein, Plaintiffs point out that Carranza promoted non-party Meisha Ross Porter to Executive Superintendent.  In that role, she was quoted saying: "When I am selecting principals, teachers, or leaders . . . we make [a] list" and "we count . . . how many people of color" are on the list; "I look at the makeup, and I literally count—and it's OK for us to do that" [ECF No. 60-65].  Porter ultimately succeeded Carranza as chancellor of the DOE when he stepped down in 2021.  *See* Carranza Depo. at 196:23.

## B.  The Plaintiffs and the Evidence of their Demotions

### 1.  Herrera

Plaintiff Lois Herrera is a white woman.  Def 56.1 ¶ 33; Pl. Counter 56.1 ¶ 33.  She began working at the DOE in 1986 as a guidance counselor.  Herrera Decl. ¶ 2.  Over the course of her

career, she "earned a Master's Degree from Harvard University Graduate School of Education," "nearly completed [a] doctorate" from Columbia Teacher's College, and "received a Professional Diploma in School/District Administration and Supervision" from St. John's University.  Herrera Decl. ¶ 3.  She also has a number of "professional certifications from the City and State of New York" related to her work.  *Id.*

Herrera was "promoted numerous times" during her career at the DOE.  Def. 56.1 ¶ 34; Pl. Counter 56.1 ¶ 34; Herrera Decl. ¶ 2; *see* Herrera Decl. ¶¶ 4–10.  In 2015, during the first term of de Blasio's mayoralty, and before Carranza became chancellor, Herrera was promoted to Chief Executive Officer of the Office of Safety and Youth Development ("OSYD").  Def. 56.1 ¶ 36; Pl. Counter 56.1 ¶ 36; Herrera Decl. ¶ 10.  In order to secure this position, she went through a competitive hiring process.  Pl. Counter 56.1 ¶ 36; *see* Herrera Decl. ¶ 10.  The job was posted publicly, and candidates were required to possess both a Master's Degree and certification as a School District Administrator.  Herrera Decl. ¶ 10.  Herrera was interviewed "twice by small groups and then by [the] Deputy Chancellor" at the time.  Herrera Decl. ¶ 10.

As CEO of OSYD, Herrera "oversaw a department of 250 employees."  Herrera Decl. ¶ 11.  She had a long list of major responsibilities.  *See* Herrera Decl. ¶ 11.  Her "work culminated in the 2017-2018 school year being celebrated by City Hall as being the **safest school year on record**."  Herrera Decl. ¶ 13 (emphasis in original).

After Carranza became Chancellor in the spring of 2018, he promoted non-party LaShawn Robinson, "an African American female," to Deputy Chancellor.  Herrera Decl. ¶ 18.  He put Robinson in charge of a "new Division of School Climate and Wellness" and placed Herrera's OSYD within that Division.  Herrera Decl. ¶ 18.

In September 2018, Robinson "told [Herrera] that [she] was going to be removed from [her] position as CEO [of OSYD]" and would instead be a "Senior Administrator for youth

development on policy, a position that never before existed."  Herrera Decl. ¶ 36; *see* Def. 56.1 ¶ 41; Pl. 56.1 ¶ 41.  Herrera "immediately" understood that she was "being demoted," since "[t]he title of Senior Administrator is many levels below CEO."  Herrera Decl. ¶ 36.  Robinson informed Herrera that Mark Rampersant, a black man who had previously reported to Herrera, "would be taking over as head of OSYD."  Robinson Depo. at 190:12–15; Herrera Decl. ¶ 45.

It is undisputed that Carranza did not personally make these staffing decisions.  Def. 56.1 ¶ 44; Pl. 56.1 ¶ 44.  According to Defendants, Robinson made a "strategic decision" to change Herrera's role so she could serve as "a partner" on Robinson's "central team."  Robinson Depo. at 186:15–187:8.  But Robinson admitted they only ever had "a few meetings."  Robinson Depo. at 187:15–24; Herrera Decl. ¶ 63 (two meetings).

Herrera attests that she was left with "no job description," does not supervise anyone, and has no supervisor.  Herrera Decl. ¶¶ 62, 63.  She lost her "former desk" and was told to "sit at whatever empty desk [she] could find."  Herrera Decl. ¶¶ 58, 59.  On some occasions, she had to sit "in the cafeteria or the hallway," which she found "degrading."  Herrera Decl. ¶ 58.

Defendants suggest Herrera was not demoted because "[f]ollowing her reassignment, [her] salary increased from $191,134.00 to $195,435.00."  Def. MSJ at 3.  Plaintiffs respond that the increase in Herrera's salary reflects only that, at the time Herrera's role changed, "all managers employed by the City . . . received a cost-of-living increase" in their salaries.  Herrera Decl. ¶ 56.  Plaintiffs add that Herrera did not receive the raise she would have expected to receive if she had not been demoted.  Herrera Decl. ¶ 56.  Meanwhile, according to Plaintiffs, Rampersant received "a 35% raise."  Herrera Decl. ¶ 56.

The DOE did not have a competitive hiring process to replace Herrera as head of OSYD. Herrera Decl. ¶ 46; *see* Robinson Depo. at 193:22–24.  There was never "a job posting for the position."  Robinson Depo. at 193:22–24.  Rather, Robinson admitted that she only considered two

candidates, both of whom were African American men.  Robinson Depo. at 186:3–14.  According to Plaintiffs, Rampersant did not have credentials comparable to Herrera's, nor did he possess "the proper licensure" to supervise her former staff.  Herrera Decl. ¶¶ 50 51.

### 2.  Murray

Plaintiff Jaye Murray is a white woman.  Def. 56.1 ¶ 53; Pl. Counter 56.1 ¶ 53.  She began working at the DOE in 2006 as a school social worker.  Def. 56.1 ¶ 54; Pl. Counter 56.1 ¶ 54; Murray Decl. ¶ 2.  In the sixteen years she worked at the DOE, she was "promoted numerous times."  Def. 56.1 ¶ 54; Pl. Counter 56.1 ¶ 54; Murray Decl. ¶ 2.  Muray's professional credentials include being "a licensed social worker," earning "two Master's Degree[s]," and completing some doctorate-level work.  Murray Decl. ¶¶ 3, 4.

In August 2015, before Carranza was chancellor, Murray was promoted to Executive Director of the Office of Counseling Support Programs ("OCSP").  Murray Decl. ¶ 6.  In that role, Murray developed and oversaw two signature programs of the de Blasio administration's DOE: the "Single Shepherd Program," which was designed to support students in the highest poverty areas "by assigning one counselor or social worker, at an unprecedented 1:100 counselor to student ratio to 'shepherd' them from sixth to twelfth grade, with no interruption of support or services"; and the "Comfort Dog Program."  Murray Decl. at 3.[2]  Murray also "managed the Substance Abuse Prevention & Intervention Specialists" at the DOE.  Murray Decl. at 3.  In 2017, Murray was named the "New York State School Social Worker of the Year" by the New York State School Social Workers' Association.  Murray Decl. ¶ 9.

After Carranza became chancellor, Murray's OCSP, like Herrera's OSYD, was placed under Robinson's Division of School Climate and Wellness.  Murray Decl. ¶ 19.  Murray then

---

[2] The Court refers to the page number because the relevant paragraphs are misnumbered, starting with the second paragraph 1 near the top of page 3.

"learned from a colleague" that "Robinson had told [Murray's] staff that they would now be reporting to Kenyatte Reid ("Reid"), an African American male," who had been working for Herrera on safety matters.  Murray Decl. ¶ 29.  Reid did not have any background or degree in counseling.  Murray Decl. ¶ 29.

Thereafter, according to Murray, she was "told" she was being "demoted from 'Executive Director' to 'Director.'"  Murray Decl. ¶ 36.  Murray maintains she was further told that "the work [she was] responsible for as Executive Director of OCSP" would instead "be led by Gillian Smith ('Smith'), an African American female."  Murray Decl. ¶ 36.  "Smith would now be the Executive Director and would supervise all but two of [her] reports."  Murray Decl. ¶ 36.  Ultimately, according to Murray: she was told to report to Smith; "90% of [Murray's] work streams [were] taken away," including the Single Shepard and Comfort Dog programs; Murray "no longer had the ability to make budgetary or staffing decisions"; and Smith supervised Murray's "last two subordinate employees." Murray Decl. ¶¶ 41, 43, 44, 54, 57, 58.

Defendants suggest that, although Smith became the "Executive Director, overseeing areas of counseling supports," Murray "continue[d]" much of her work.  Def. MSJ at 10.  In addition, Smith testified at a deposition that "officially [Murray's] title [remained] Executive Director" and that "she wasn't demoted," even though Murray reported to Smith [ECF No. 60-9 ("Smith Depo.") at 77:4–6, 81:17–18, 83:23; *see* 84:5–7].  Plaintiffs contend that "Smith's testimony was not credible," since she was "unable to answer . . . what [Murray] was the 'Executive Director' of."  Murray Decl. ¶ 47.  Specifically, Smith testified that Murray remained "the Executive Director of Office School Counseling and Support" but admitted that was "an office that no longer exists." Smith Depo. at 85:4–11.

According to Plaintiffs, Smith had "never been a counselor or social worker."  Murray Decl. ¶ 36.  Smith confirmed that she did not have a license as a social worker or a guidance

counselor.  Smith Depo. at 57:10–15.  Plaintiffs offer evidence that "[t]here was no competitive process that led to Smith being given [Murray's former] role."  Murray Decl. ¶ 39; *see* Smith Depo. at 50:19–22, 56:9–15, 58:16–20.

It is undisputed that Carranza did not personally make these staffing decisions.  Def. 56.1 ¶ 70; Pl. 56.1 ¶ 70.  It appears that Robinson made the decision to promote Smith.  *See generally* Robinson Depo. at 222–224.  It is also undisputed that Murray's salary initially remained the same when her role changed and has since increased.  Def. 56.1 ¶¶ 66, 67; Pl. 56.1 ¶¶ 66, 67.

### 3.  Feijoo

Plaintiff Laura Feijoo is a white woman.  Def. 56.1 ¶ 71; Pl. 56.1 ¶ 71.  She began working at the DOE in 1989 as a teacher and was "promoted numerous times during her tenure with the DOE."  Def. 56.1 ¶ 72; Pl. 56.1 ¶ 72; *see* Feijoo Decl. ¶ 4.  Her credentials include "a Doctorate degree in Educational Leadership from New York University, Professional Diploma in School Administration, a Master's Degree in Special Education, and a Bachelor's Degree in Education, all from Queens College."  Feijoo Decl. ¶ 3.

In 2014, before Carranza was the chancellor, Feijoo was promoted to Senior Supervising Superintendent, a cabinet-level position.  Feijoo Decl. ¶ 5.  In that role, Feijoo supervised all 46 DOE superintendents and their teams.  Feijoo Decl. ¶ 6; *see* Carranza Depo. 116:10–12.  Plaintiffs maintain that Feijoo had "an excellent reputation" and "the respect of the superintendents" she supervised.  Feijoo Decl. ¶ 6.  Indeed, Carranza testified that "it was very obvious that she was well-liked."  Carranza Depo. 116:4–6; *see also* de Blasio 33:12–13.

In May 2018, within weeks of becoming chancellor, "Carranza appeared at [Feijoo's] monthly meeting with the Superintendents with Cheryl Watson-Harris . . . an African American female."  Feijoo Decl. ¶ 11.  Watson-Harris had joined in the DOE in 2015, oversaw the team that "offered operational support to schools," and, Feijoo contends, was perceived by the chancellor

who preceded Carranza, as well as the deputy to whom both Feijoo and Watson-Harris reported, as "struggling in her role."  Feijoo Decl. ¶ 12.

Feijoo learned that, "following [her] Superintendent's meeting," Watson-Harris held a meeting with only "African American Superintendents."  Feijoo Decl. ¶ 13.  According to Feijoo, Watson-Harris advised the attendees that "changes [were] coming to the DOE."  Feijoo Decl. ¶ 13.  She "made it clear that she would have an important role and that she wanted the attendees to know that she would be selecting them for positions within the newly restructured DOE."  Feijoo Decl. ¶ 13.  Soon thereafter, Feijoo contends, superintendents complained to her about Watson-Harris "directing their work when she did not supervise them."  Feijoo Decl. ¶ 14.

Carranza thereafter met with Feijoo in June 2018.  Feijoo Decl. ¶ 15; Def. 56.1 ¶ 82; Pl. 56.1 ¶ 82.  "Carranza informed Feijoo that she was going to be senior advisor on Labor and Policy."  Def. 56.1 ¶ 82; Pl. 56.1 ¶ 82.  Carranza testified that he did not consider the change in Feijoo's role a demotion.  Carranza Depo. at 99:16–18.

The parties dispute why Carranza changed Feijoo's role.  Defendants aver that Feijoo had been "a key point person working with the unions."  Def. 56.1 ¶ 85.  Defendants contend, however, that Carranza was "underwhelmed" by Feijoo's answers to his questions about the supervision of superintendents. Def. 56.1 ¶ 81; *accord* Carranza Depo. at 115:22–117:7.

Plaintiffs contend that Carranza had already made up his mind "to sideline" Feijoo because of her race "before [she] had even met with the Chancellor."  Feijoo Decl. ¶ 16.  In support of that contention, Feijoo attests that Carranza "came [to their meeting] with a prepared statement to read" about the change in her role and had been "nodding off" when she spoke.  Feijoo Decl. ¶¶ 15, 16 (he "read off a script"), 17.  Feijoo attests that "Carranza did not ask" any questions about the supervision of superintendents.  Feijoo Decl. ¶ 17.  She adds that working with the unions had been "a very small part of [her] overall body of work" and she "was hardly a 'key' person as the

11

DOE claims."  Feijoo Decl. ¶ 37.

Feijoo attests that she was "named Labor & Policy Advisor," but "after pleading" to keep a superintendent title, "it was changed to Senior Superintendent for Labor & Policy."  Feijoo Decl. ¶ 36.  She adds that "[d]espite the title, [she] had no real work."  Feijoo Decl. ¶ 36.

According to Plaintiffs, "[t]here were at least four roles [Feijoo] could have competently filled" in the newly restructured DOE.  Feijoo Decl. ¶ 35.  There was an open "role for First Deputy Chancellor," the "second-in-command" to Carranza, which would have been a promotion for Feijoo.  Feijoo Decl. ¶¶ 20, 24; *see* Feijoo Decl. ¶¶ 22, 23, 35.  Watson-Harris was chosen as First Deputy Chancellor.  Feijoo Decl. ¶ 22.

According to Plaintiffs, Watson-Harris did not have the necessary licensure when she was selected for the role.  Feijoo Decl. ¶ 24.  There was no open, competitive process to fill the position.  Feijoo Decl. ¶ 23; Ramirez Depo. at 101:15–17; *see* Carranza Depo. at 65:24–67:14.  Carranza testified that he considered "about three or four people" for the role of First Deputy Chancellor, including Feijoo, and "made a choice."  Carranza Depo. at 66:5, 67:16–22.  But he acknowledged that he never told Feijoo she was a candidate or interviewed her for the role.  Carranza Depo. at 67:23–68:4.  Indeed, he did not "formally interview anybody" for First Deputy Chancellor.  Carranza Depo. at 68:11–12.

Feijoo also could have been included among the nine new "Executive Superintendents."  Feijoo Decl. ¶ 29.  "Seven of the nine roles were filled by African American employees, all of whom had been at the meeting that Watson-Harris had called of only African American superintendents."  Feijoo Decl. ¶ 31.  Feijoo was given "no role in supervising the 46 superintendents." Feijoo Decl. ¶ 30.  And two "men of color . . . [took] over the remainder of [her] work streams."  Feijoo Decl. ¶ 30.

The parties agree that Carranza "made the personnel decisions regarding Feijoo's role in

his administration." Def. 56.1 ¶ 79; Pl. 56.1 ¶ 79.  The Court notes, however, that Carranza testified

that the mayor had "final approval" and had to "sign off" on who was in his cabinet at the DOE.

Carranza Depo. at 33:15–34:13 ("Under mayoral control, the mayor has final say especially for

senior leadership roles, deputy chancellors, chiefs.").  It is undisputed that Feijoo's salary increased

after her role changed.  Def. 56.1 ¶¶ 89, 90; Pl. 56.1 ¶¶ 89, 90.

### C. Procedural History

Plaintiffs initiated this case in state court, and Defendants removed the case to this Court

[ECF Nos. 1, 1-3 ("Cmpl.")].  In the operative pleading, each Plaintiff asserts claims against both

Defendants for racial discrimination in violation of 42 U.S.C. §1983 ("Section 1983"), for sex

discrimination in violation of 42 U.S.C. §1983, and for race and sex discrimination in violation of

the New York City Human Rights Law ("NYCHRL").  *See* Cmpl. ¶¶ 116–251.  Defendants move

for summary judgment on all of Plaintiffs' claims [ECF Nos. 44, 55, 56, 57 ("Def. Mem."), 69].

Plaintiffs oppose the motion [ECF Nos. 60, 61, 62, 63, 64, 65, 66, 67 ("Pl. Opp."), 68].  But they

represent in their brief that "Plaintiffs do not pursue their claims under the New York City Human

Rights Law."  Pl. Opp. at 2 n.1.

## II.       LEGAL STANDARD

To succeed on their motion for summary judgment, Defendants must show "that there is

no genuine dispute as to any material fact and that [Defendants are] entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(a).  "If 'there is any evidence in the record from which a reasonable

inference could be drawn in favor of the [plaintiffs], summary judgment is improper.'"  *Brooklyn*

*Ctr. for Indep. of the Disabled v. Metro. Transportation Auth.*, 11 F.4th 55, 64 (2d Cir. 2021)

(brackets in original) (quoting *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)).  The

Court "may not make credibility determinations or weigh the evidence."  *Jaegly v. Couch*, 439

F.3d 149, 151 (2d Cir. 2006).  It "must resolve all ambiguities and draw all permissible inferences

in favor of the non-moving party." *Id*.

### III.    DISCUSSION

The Equal Protection Clause of the Fourteenth Amendment of the Constitution prohibits "race-based state action." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 204 (2023). As the Supreme Court explained in *Students for Fair Admissions*, "[e]liminating racial discrimination means eliminating all of it." *Id.* at 206. "The guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color." *Id.* (quoting *Regents of Univ. of Cal. v. Bakk*e, 438 U.S. 265, 289–290 (1978) (opinion of Powell, J.)).

Plaintiffs offer evidence of "race-based state action" at the DOE. *Id.* at 204. Both the mayor and the person who led the effort to select the leadership of the DOE confirmed that race was an "[i]mportant factor" in "hiring decisions at the DOE." de Blasio Depo. at 50:7–15; *see* de Blasio Depo. at 26:13–15; *id.* at 26:18–20; *id.* at 26:7–12; Ramirez Depo. at 42:18–43:2; Ramirez Email ("a priority"). Indeed, the mayor testified that it was "a policy" of his administration to consider race in staffing decisions because he wanted the racial composition of his administration to mirror the racial diversity of the City. de Blasio Depo. at 26:13–15. Carranza, too, testified that he believed it was "important"—that it was "a priority for [him] as well" as the mayor—for the "senior leadership" of the DOE to "look like" the mostly "black and brown" students in DOE schools. Carranza Depo. at 86:20–87:5, 129:22–130:16. While Carranza denied acting on this belief and priority, a reasonable "fact-finder [could] conclude that [Carranza] was not telling the truth." *Terry v. Ashcroft*, 336 F.3d 128, 139 (2d Cir. 2003).

Plaintiffs' evidence certainly permits "a reasonable inference" that Carranza and his DOE implemented a policy of demoting and side-lining white staffers, including Plaintiffs, in order to change the racial composition of the leadership. *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th

at 64.  The mayor, the chancellor, and others admitted they believed that high-level staff of the DOE should have a particular racial composition.  Perhaps they subscribed to the idea, which took hold in other educational institutions in this country, that present discrimination may be a righteous cause that is required to correct past discrimination.  Perhaps Carranza shared his successor's belief that it was "OK for [the DOE]" to "look at the makeup, and . . . literally count" people by race [ECF No. 60-65].  Perhaps the chancellor endorsed the instruction at his agency's training sessions, at which instructors informed white staffers that "moving towards racial equity" means "you will have to step back from things" and "might fear losing your job."  Chislett Decl. ¶ 15.  But demoting certain employees in an effort to curate the racial composition of the staff is illegal, even if the employees who are demoted are white.

Defendants argue that they are entitled to summary judgment on Plaintiffs' Section 1983 claims, even if there is evidence of a *policy* of race-based discrimination at the DOE, because "Plaintiffs have failed to establish liability on their *individual* § 1983 discrimination claims."  Def. MSJ at 7 (emphasis added).  First, Defendants appear to dispute that Plaintiffs suffered adverse employment actions.  Second, Defendants argue that "Plaintiffs' race did not have a determinative influence on the employment actions related to Plaintiffs."  Def. MSJ at 8.

At this stage, Plaintiffs are not required to prove that Carranza and the DOE used race as a determinative factor in employment decisions.  The Court expresses no opinion about Defendants' ultimate liability.  But there is evidence in the record from which reasonable inferences may be drawn in favor of Plaintiffs' version of events.  Drawing "all permissible inferences in favor of" Plaintiffs, a jury could find that each Plaintiff suffered an adverse employment action she would not have suffered but for her race. *Jaegly*, 439 F.3d at 151.

As explained below, Defendants also argue that there is no evidence of sex discrimination in violation of Section 1983.  Defendants are correct. Defendants are also entitled to summary judgment on all of Plaintiffs' NYCHRL claims, as Plaintiffs effectively concede.

### A. Section 1983

Section 1983 authorizes a civil action against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  "Section 1983 'is not itself a source of substantive rights.'"  *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  Rather, it provides "a method for vindicating federal rights elsewhere conferred," such as by the Equal Protection Clause.  *Id.*; *see also Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (explaining that Section 1983 and the Equal Protection Clause protect public employees from discrimination).

When a Section 1983 defendant is a municipality, or a municipal agency such as the New York City Department of Education, a plaintiff is required to show that the challenged acts were performed pursuant to an "official policy" or custom.  *Okin v. Village of Cornwall–On–Hudson Police Dep't*, 577 F.3d 415, 439 (2d Cir. 2009) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)).  "The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right."  *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020).  Put another way, "to establish municipal liability under [Section] 1983, a plaintiff must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury."  *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)).

Where the alleged constitutional injury is race or sex-based employment discrimination, courts apply a version of the burden-shifting test for Title VII claims set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019). "The basic elements of such claims, whether pursued under Title VII or [Section] 1983," require a plaintiff to show that "she suffered an 'adverse employment action' taken 'because of' her [race or] sex." *Naumovski*, 934 F.3d at 212 (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015)); *see Vega*, 801 F.3d at 83 ("a [Title VII] plaintiff must . . . establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination") (internal quotation marks and citation omitted).[3]

The Second Circuit has explained, however, that "[Section] 1983 and Title VII claims differ in important ways." *Naumovski*, 934 F.3d at 213. While a defendant may be liable under Title VII if race or sex was "merely" a "motivating factor," mixed in with legitimate reasons, for an adverse employment action, Section 1983 requires a showing of "but-for" causation. *Naumovski*, 934 F.3d at 214. The "but-for" causation standard requires showing that "the employee's protected trait actually played a role" and "had a determinative influence" in the employer's decision-making process. *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 176 (2009) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). Crucially, however, the "but for" standard does not require Plaintiffs to show that discrimination was the sole and exclusive reason for the adverse decision. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020); *see also Kwan v. Andalex Group, LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

---

[3] Defendants do not dispute that white plaintiffs belong to "a protected class, i.e., a 'race' or 'color.'" *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009).

### 1.   Plaintiffs Offer Evidence of Adverse Actions.

Insofar as Defendants contend that Plaintiffs did not suffer adverse employment actions, Plaintiffs offer ample evidence to raise a genuine dispute.  An adverse employment action is a "materially adverse change in the terms and conditions of employment." *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007) (internal quotation marks and citation omitted).  It is "more disruptive than a mere inconvenience" or "alteration of job responsibilities." *Terry*, 336 F.3d at 138 (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).  The Second Circuit has explained that materially adverse changes include "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Terry*, 336 F.3d at 138 (quoting *Galabya*, 202 F.3d at 640).

It is not clear that Defendants even contest that Herrera suffered an adverse employment action.  However, they cite Robinson's testimony that she made a "strategic" decision to change Herrera's role in order to have Herrera as a "partner" on Robinson's team.  Def. MSJ at 8; *see* Robinson Depo. at 186:15–187:8. Defendants also stress that Herrera's salary increased a fraction after her role changed.  Def. MSJ at 8; *see* Def. 56.1 ¶¶ 45–46.

Plaintiffs offer significant evidence that Herrera was demoted.  Herrera testified that she "immediately" understood that she was "being demoted" because Robinson stripped her of her title as CEO of OYSD, and "[t]he title of Senior Administrator is many levels below CEO." Herrera Decl. ¶ 36.  The Second Circuit has recognized that "a less distinguished title" itself may be an adverse action. *Terry*, 336 F.3d at 138.

Herrera also testified that she was stripped of all "direct reports" and left with no formal responsibilities.  Herrera Decl. ¶¶ 36, 62, 63; *see* Robinson Depo. at 262:12–15.  Robinson's own testimony about her limited interactions with Herrera undermines the notion that Robinson used

Herrera as a strategic partner.  *See* Robinson Depo. at 187:15–24; *see also* Herrera Decl. ¶ 63.  In other words, there is evidence Herrera suffered an adverse action in the form of "significantly diminished material responsibilities."  *Sanders v. New York City Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (quoting *Terry*, 336 F.3d at 138).

Finally, salary is not a *sine qua non*.  *See Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997).  Herrera's salary increased from $191,134.00 to $195,435.00.  Def. 56.1 ¶¶ 45–46.  According to Plaintiffs, "all managers employed by the City . . . received a cost-of-living increase" in their salaries at that time.  Herrera Decl. ¶ 56.  But Herrera did not receive the raise she would have expected to receive if she had not been demoted.  Herrera Decl. ¶ 56.  Meanwhile, Rampersant received "a 35% raise."  Herrera Decl. ¶ 56.

There is likewise a genuine dispute whether Murray was demoted.  There is competing testimony as to whether Murray retained the title of "Executive Director" or was assigned the less distinguished title of "Director."  *See* Murray Decl. ¶¶ 36, 46, 47.  In addition, Murray was removed from the Single Shepard and Comfort Dog programs, among other responsibilities.  *See* Murray Decl. ¶¶ 43, 54, 57.  There is evidence in the record to permit a reasonable jury to find that Murray was demoted.  *See Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 64.

Feijoo was removed from her role as Senior Supervising Superintendent, a cabinet-level position.  *See* Feijoo Decl. ¶ 5.  She was initially named an "Advisor," but "after pleading" for a more distinguished title, she was named "Senior Superintendent for Labor & Policy."  Feijoo Decl. ¶ 36.  In any event, she attests, she "had no real work."  Feijoo Decl. ¶ 36.  She had previously supervised all 46 of the DOE superintendents and their teams, but Carranza gave Feijoo "no role" in their supervision.  Feijoo Decl. ¶¶ 6, 30.

Defendants express disdain for what they characterize as Feijoo's "believed entitlement to the position of First Deputy Chancellor."  Def. MSJ at 12.  But it is well-established that being

passed over for promotion may be an adverse action. *See Aulicino*, 580 F.3d at 80; *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004).[4]  On the record before the Court, Feijoo's contention that she "could have been named First Deputy Chancellor" was not mere flight of fancy.  Feijoo Decl. ¶ 35.  Carranza testified that he considered her for the role, although he did not select her, inform her that she was a candidate, or interview her (or anyone).  Carranza Depo. at 67:16–22. Whether his testimony is credible is a jury question.  *See Jaegly*, 439 F.3d at 151.

### 2. Plaintiffs Offer Evidence To Support an Inference of Race-Based Discrimination.

Next, Defendants argue that the changes in Plaintiffs' roles did not occur in circumstances giving rise to an inference of discrimination. Defendants contend that, instead, Plaintiffs' roles changed as part of a larger effort to restructure the DOE to get better results.  Of course, the DOE and Carranza as chancellor had the prerogative, indeed, the obligation, to make any personnel changes at the DOE necessary to improve education for the students of New York City.  However, if there was an idea abroad at the agency that students would be better served in their education if the DOE simply changed the racial composition of its leadership, such circumstances could give rise to an inference of illegal discrimination against Plaintiffs.

At this stage, Plaintiffs' burden to show circumstances giving rise to an inference of discrimination is low.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).  Indeed, in a Title VII case, "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage." *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).  Plaintiffs offer ample evidence to

---

[4] With narrow exceptions, an employee cannot establish a *prima facie* case of discriminatory failure to promote without evidence that she specifically applied for the position.  *Petrosino*, 385 F.3d at 227.  The exceptions involve situations where, as here, the position was not publicly posted and there was an "informal" hiring process.  *Id.*  It is not clear whether Feijoo falls within an exception, but she need not rely on a failure-to-promote theory, since she presents evidence that she was demoted.

raise a genuine dispute.  Defendants simply ignore the evidence that Plaintiffs present and insist that race was not a factor, let alone determinative.

As an initial matter, Plaintiffs offer evidence that they were not demoted because of poor performance.  *McDonnell Douglas*, 411 U.S. at 802 (holding that the plaintiff established a *prima facie* case of racial discrimination in part because "his past work performance in petitioner's employ was 'satisfactory'").  For example, as CEO of OSYD, Herrera's "work culminated in the 2017-2018 school year being celebrated by City Hall as being the safest school year on record."  Herrera Decl. ¶ 13 (emphasis omitted).  Murray was named the "New York State School Social Worker of the Year" in 2017.  Murray Decl. ¶ 9.  Defendants do not appear to contest the quality of Herrera's and Murray's work performance.

There is a dispute with respect to Feijoo.  Carranza confirmed that Feijoo was held in high esteem.  Carranza Depo. 116:4–6; *see also* de Blasio 33:12–13.  However, he testified that he changed Feijoo's role because he was "underwhelmed" by Feijoo's answers to his questions about the supervision of superintendents.  Carranza Depo. at 115:22–117:7.  Plaintiffs raise a genuine dispute whether Carranza had already made up his mind "to sideline" Feijoo because of her race "before [she] had even met with the Chancellor."  Feijoo Decl. ¶ 16.  Specifically, Feijoo attests that, when she met with Carranza, the chancellor did not ask any questions about her supervision of superintendents, nodded off while she spoke, and already had "a prepared statement to read" about changing her role.  Feijoo Decl. ¶¶ 15, 16, 17.  This dispute weighs against Defendants' request for summary judgment.

In addition, Plaintiffs were all replaced with individuals of a different race from Plaintiffs, whom Plaintiffs contend had lesser qualifications.  *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).  Herrera was replaced as head of OSYD by Rampersant, a black man. *See* Robinson Depo. at 190:12–15; Herrera Decl. ¶ 45.  According to Plaintiffs, Rampersant did

not have credentials or professional experience comparable to Herrera's, nor did he possess "the proper licensure" to supervise her former staff. Herrera Decl. ¶¶ 50, 51. Murray was replaced as the head of "counseling supports" by Smith, a black woman. Murray Decl. ¶ 36. Unlike Murray, Smith had no experience or license as a social worker or guidance counselor. *See* Murray Decl. ¶¶ 3, 4; Smith Depo. at 57:10–15.

As noted above, Feijoo contends that she was passed over for promotion to First Deputy Chancellor in favor of Watson-Harris, a black woman. *See* Feijoo Decl. ¶¶ 11, 22. According to Plaintiffs, Watson-Harris had been perceived as "struggling" in a less senior position and lacked the proper license to be First Deputy Chancellor when she was selected. Feijoo Decl. ¶¶ 12, 24. Feijoo also was not included among the nine new Executive Superintendents, seven of whom were black. Feijoo Decl. ¶ 31. And two "men of color . . . [took] over the remainder of [her] work streams." Feijoo Decl. ¶ 30.

Defendants contend that Plaintiffs' replacements were all amply qualified and, as such, Plaintiffs cannot show that race had "any determinative influence." Def. MSJ at 8–12. That may ultimately prove to be so. However, the Court cannot simply accept Defendants' contention where "there is *any* evidence in the record" that supports Plaintiffs' position. *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 64 (emphasis added). There is evidence that Plaintiffs were replaced by people of a different race. *See Zimmermann*, 251 F.3d at 381. And there is *some* evidence that Plaintiffs' replacements were less qualified. *See*, 43 F.3d at 37.

Plaintiffs also offer evidence that the DOE and Carranza did not hold open, competitive hiring processes to replace them. For example, when Herrera became head of OSYD, she applied for a publicly-posted position, candidates were required to have certain credentials, and Herrera was subjected to a formal interview process. Pl. Counter 56.1 ¶ 36; *see* Herrera Decl. ¶ 10. By contrast, Robinson admitted that there was never even "a job posting" to replace Herrera as head

of OSYD and that Robinson only considered two potential candidates, both of whom were black, before simply selecting Rampersant.  Robinson Depo. at 186:3–14, 193:22–24.  Plaintiffs similarly offer evidence that "[t]here was no competitive process that led to Smith being given [Murray's former] role."  Murray Decl. ¶ 39; *see* Smith Depo. at 50:19–22, 56:9–15, 58:16–20.

With respect to Feijoo's non-promotion, Plaintiffs offer several sources of evidence that there was no competitive process for the First Deputy Chancellor position, including testimony by Carranza and Ramirez.  Feijoo Decl. ¶ 23; Ramirez Depo. at 101:15–17; *see* Carranza Depo. at 65:24–67:14.  Carranza testified that he did not interview anyone.  Carranza Depo. at 68:11–12. With respect to the other roles Feijoo contends she was qualified to fill, "[s]even of the nine" new Executive Superintendents "had been at the meeting that Watson-Harris had called of only African American superintendents."  Feijoo Decl. ¶ 31.  Based on the lack of open, competitive hiring processes, a jury could infer that the DOE and Carranza were motivated by race, instead of merit, when they replaced Plaintiffs.  *Cf. Evans v. Port Auth. of New York & New Jersey*, 192 F. Supp. 2d 247, 258 (S.D.N.Y. 2002).

Plaintiffs also offer evidence of "invidious comments" about their protected characteristic in support of their *prima facie* case.  *Chambers*, 43 F.3d at 37; *see Ostrowski v. Atlantic Mutual Insurance Companies*, 968 F.2d 171, 182 (2d Cir. 1992).  Robinson, who made the decisions with respect to Herrera and Murray, allegedly made a disparaging comment about "Whiteness" during a training session.  *See* Chislett Decl. ¶¶ 10, 32; Herrera Decl. ¶ 19.  According to Plaintiffs, this comment fit with the new "tenor and subject matter of [equity] trainings . . . when Carranza became Chancellor."  Chislett Decl. ¶ 7.  Plaintiffs also attest that Carranza stated: "This is our time.  Our time, while standing with only "Black and Latino individuals."  Feijoo Decl. ¶ 28.  According to Plaintiffs, Carranza was "clearly" stating that it was time for "people of color" to lead the DOE. Pl. Opp. at 6.  A jury might not believe Plaintiffs that Carranza made this statement, might disagree

with Plaintiffs' interpretation, or might consider such a statement, at best, weak evidence of racial animus by Carranza.  The same is true of the disputed contention that Carranza endorsed the idea of the DOE as Wakanda.  *See* Herrera ¶ 16; Carranza Depo. at 193:2–24.  But it is not for the Court, on summary judgment, to evaluate credibility or weigh evidence.  *Jaegly*, 439 F.3d at 151.  Plaintiffs have met their low burden to make a *prima facie* showing that they suffered adverse employment actions in circumstances giving rise to an inference of discrimination.

Defendants maintain that, in all events, Plaintiffs cannot prove that race was the "but-for" cause of their demotions.  On summary judgment, Plaintiffs are not required to prove that race was a determinative factor in the DOE and Carranza's decisions.  They are required to make a *prima facie* case.  *See Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004).  The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent" because "[w]here an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  Here, Plaintiffs offer testimony from both the mayor and Carranza that the racial composition of high-level DOE staff was "important" and a "priority."  de Blasio Depo. at 50:7–15; Carranza Depo. at 86:20–87:5, 129:22–130:16. The Court is required to draw "all permissible inferences in favor of" Plaintiffs.  *Jaegly*, 439 F.3d at 151.  As such, Defendants are not entitled to a judgment from the Court that Plaintiffs' race was not determinative.

### 3. Plaintiffs Offer Evidence of a Policy of Race-Based Discrimination.

Defendants argue that, even if Plaintiffs have made a *prima facie* showing of individual discrimination, Plaintiffs should not be permitted to proceed with their *Monell* claims against the DOE.  As noted above, "[t]he elements of a *Monell* claim are (1) a municipal policy or custom that

(2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Agosto*, 982 F.3d at 97. Defendants assert that "[d]espite Plaintiffs obtaining a substantial amount of discovery in this case, there is not a scintilla of evidence in the record – at all – to plausibly suggest any such policy existed." Def. MSJ at 14. That assertion is indefensible.

To proceed on a *Monell* claim, a plaintiff must show that "the municipality was the 'moving force' behind the injury alleged." *Agosto*, 982 F.3d at 98 (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404 (1997)). The "municipality may be liable for the acts of a single official . . . 'whose edicts or acts may fairly be said to represent official policy' for the entire municipality." *Agosto*, 982 F.3d at 98 (quoting *Monell*, 436 U.S. at 694)); *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986); *Hines v. Albany Police Dept.*, 520 F. Appx. 5, 7 (2d Cir. 2013). Here, both the mayor and the chancellor of the DOE had municipal policymaking authority for purposes of *Monell*. *See Agosto*, 982 F.3d at 98–99.

Insofar as Defendants contest that de Blasio was a final decisionmaker and set policy with respect to hiring high-level DOE staff, Plaintiffs offer more than enough evidence to survive summary judgment. Witnesses have testified about a system of "mayoral control," in which "the mayor ha[d] final say especially for senior leadership roles, deputy chancellors, chiefs." Carranza Depo. at 33:15–34:13; *see* Ramirez Depo. at 88:23–25 ("in a mayoral-controlled district, we raised up all high-level personnel and policy decisions through the mayor"). Moreover, Carranza and Ramirez confirmed that the mayor was "very involved" and "very interested" in staffing decisions at the DOE, and his interest was not limited to cabinet-level positions. Ramirez Depo. at 21:12–13; Carranza Depo. at 33:22–33:24; *see* Ramirez Depo. at 35:23–36:2.

Defendants insist the Court should enter judgment in their favor because, at his deposition, Carranza swore that de Blasio did not specifically instruct him to consider the race of high-level staff *at the DOE* and Carranza further swore that he never took the race of candidates into account.

Def. MSJ at 14–15; *see* Carranza Depo. at 85:13–15, 86:10–12, 130:19–23.  But, as the Court has already observed, the mayor testified that it was "a policy for [his] administration to reflect the diversity of the city."  de Blasio Depo. at 26:13–15.  And de Blasio and Carranza both confirmed that de Blasio "did express" this policy to Carranza.  *See* de Blasio Depo. at 25:9–26:6; Carranza Depo. at 24:12–25:2; *id.* at 86:15–16.

Furthermore, a reasonable "fact-finder [could] conclude that [Carranza] was not telling the truth when [he] said that [he] did not consider race."  *Terry*, 336 F.3d at 139.  As discussed above, Carranza has publicly affirmed that there was "no daylight" between de Blasio and himself on the "equity agenda."  NYT Article.  He affirmed under oath that "diversity and equity [was] a priority" and he "want[ed] senior leadership to reflect the diversity of the school system."  Carranza Depo. at 87:2–5.  According to Plaintiffs, that equity agenda included a policy of "putting people of color in high-level positions" at the DOE.  Herrera Decl. ¶ 17; Murray Decl. ¶ 14; *see* Feijoo Decl. ¶ 28. Carranza maintains that the equity agenda was not specifically about race and required him to promote people based only on who would deliver results for students.  Carranza Depo. at 30:16– 23.  It is for a jury to decide whom to believe.  *See Jaegly*, 439 F.3d at 151.

Defendants stress that Carranza did not personally make the decisions to change Herrera's and Murray's roles at the DOE.  *See* Def, MSJ at 18; Def. 56.1 ¶¶ 44, 70; Pl. 56.1 ¶¶ 44, 70.  It appears that Robinson, whom Carranza had elevated to Deputy Chancellor, made those decisions. *See* Robinson Depo. at 186:15–187:8; *see generally* Robinson Depo. at 222–224.  Plaintiffs are not required to show that Carranza personally demoted them, provided that Plaintiffs can show that "a district employee" demoted them "acting pursuant to" an established policy or practice of racial discrimination.  *Hurdle v. Board of Education of City of New York*, 113 Fed. Appx. 423, 424–25 (2d Cir. 2004).

Defendants also argue that there was no policy of using race as a determinative factor in staffing decisions since the DOE and Carranza and Robinson hired or elevated a number of white people.  Def. MSJ at 15–16. However, as Defendants well know, Plaintiffs are not required to show the total exclusion of white people from the DOE to proceed on their claims of race-based employment discrimination.

In other words, whether de Blasio and Carranza set a policy at the DOE of using race as a determinative factor in hiring—which policy Carranza personally acted on with respect to Feijoo and Robinson followed with respect to Herrera and Murrary—is a factual dispute that turns in part on witness credibility.  There is evidence in the record to permit the inference that de Blasio and Carranza, as final policymakers, were the moving force behind race-based demotions that violated Plaintiffs' rights under the Equal Protection Clause.  *See Agosto*, 982 F.3d at 98.  As such, it would be inappropriate to grant summary judgment on Plaintiffs' *Monell* claims.  *See Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 64.

### B. Defendants Are Entitled to Summary Judgment on the Sex Discrimination Claims.

Defendants argue that they are entitled to summary judgment on all of the claims that the DOE and Carranza discriminated against Plaintiffs because of their sex.  Defendants are correct.  Plaintiffs have not proffered evidence of sex discrimination.  Plaintiffs barely contest this point.  In a single paragraph of their brief, Plaintiffs assert, essentially, that the white people who survived Carranza's restructuring were white men.  *See* Pl. Opp. at 25.  That is not enough.

Plaintiffs assert in their brief that they were subjected to unique discrimination, and treated as especially expendable, "not just because they were white, but because they were white women."  Pl. Opp. at 25.  While the parties offer no argument on this point, the Court is aware that the Second Circuit has held that "sex plus" discrimination is "actionable in a § 1983 case."  *Back v. Hastings*

*On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 118 (2d Cir. 2004).  The Circuit has opined that sometimes "where two bases of discrimination exist, the two grounds cannot be neatly reduced to distinct components."  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (citing *Lam v. Univ. of Haw.*, 40 F.3d 1551, 1562 (9th Cir. 1994) (discussing the "intersection of race and gender")).  However, even a claim of "sex plus" discrimination requires a plaintiff to "provide[] evidence of purposefully sex-discriminatory acts."  *Back*, 365 F.3d at 118.

Thus, to survive summary judgment, Plaintiffs would have to provide more than a scintilla of evidence that Defendants discriminated against Plaintiffs because of their sex.  Plaintiffs have not done so.  Carranza promoted Robinson, a woman, to a Deputy Chancellor position supervising Herrera.  *See* Herrera Decl. ¶ 18.  Murray was replaced by a woman.  *See* Murray Decl. ¶ 36.  The First Deputy Chancellor role went to a woman.  *See* Feijoo Decl. ¶ 11.  Some of the Executive Superintendents were women.  *See* Ramirez Depo. at 108:14–23.  There is evidence that none of these candidates were "white women," but their promotions are not "evidence of purposefully sex-discriminatory acts."  *Back*, 365 F.3d at 118.  Moreover, Plaintiffs have not offered evidence of invidious comments about women, or "white women," as a class.  There is simply no evidence in the record to support the sex-based claims.

## C. Defendants Are Entitled to Summary Judgment on the NYCHRL Claims.

In their pleading, Plaintiffs assert claims against the DOE and Carranza for discrimination based on race and sex under the New York City Human Rights Law.  *See* SAC ¶¶ 116–182.  Under New York law, a plaintiff must file a notice of claim prior to initiating a lawsuit against a school district, including the DOE, or its officers.  *See* N.Y. Educ. Law § 3813(1); *Rodriguez v. City of New York*, 193 A.D.3d 603, 142 N.Y.S.3d 800, 801 (1st Dep't 2021); *Bagarozzi v. New York City Dep't of Educ.*, No. 18-cv-4893 (RA), 2019 WL 1454316, at *4 (S.D.N.Y. Mar. 31, 2019).  It is

undisputed that Plaintiffs did not file a notice of claim before initiating this lawsuit.  Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2.  Moreover, Plaintiffs state in their brief that "Plaintiffs do not pursue their claims under the New York City Human Rights Law," in effect conceding that the claims cannot proceed. Pl. Opp. at 2 n.1.  The Court concludes that Defendants are entitled to summary judgment as to all of Plaintiffs' NYCHRL claims.

## IV.   CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is DENIED with respect to Plaintiffs' claims for race discrimination in violation of 42 U.S.C. §1983.  The motion is GRANTED with respect to the claims for sex discrimination in violation of 42 U.S.C. §1983 and all claims under the New York City Human Rights Law.

The Clerk of Court respectfully is requested to terminate the motion at docket entry 55.

**SO ORDERED.**

**Date:  January 23, 2024**
      **New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**